IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CHERISE B. LUCERO,<br><br>     Plaintiff,<br><br>vs.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,<br><br>     Defendant. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND GRANTING DEFENDANT'S MOTION FOR BENCH TRIAL ON THE PAPERS<br><br><br><br>Case No. 2:08-CV-302 TS |

   This matter is before the Court on Plaintiff's Motion for Decision on the Administrative Record, which the Court will construe as a Motion for a Bench Trial on the Papers.[1] In conjunction with Defendant's memorandum in opposition to Plaintiff's Motion, Defendant also filed a Brief in Support of Motion for a Bench Trial on the Papers.[2] The case concerns a denial of long-term disability benefits to Plaintiff by Defendant. The parties agree that the Court must make a final

---

   [1]*Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1307 n.1 (10th Cir. 2007) (noting that the Federal Rules of Civil Procedure "contemplate no such mechanism as 'judgment on the administrative record'").

   [2]An actual Motion for Bench Trial on the Papers was never filed by Defendants.

determination based solely on its review of the administrative record,[3] but disagree as to the proper standard of review which the Court must apply. Because the Employee Retirement Income and Security Act ("ERISA") preempts the Utah regulatory rule which purports to ban discretionary authority clauses, the Court will apply an arbitrary and capricious standard and grant final judgment to Defendant.

## I. FACTUAL FINDINGS

Plaintiff was an executive secretary for Intermountain Health Care ("IHC") until May 2004. As part of her employment benefits, she had a Long Term Disability Insurance Plan (the "Plan"), which was administered by Defendant. The Plan allows disability benefits to be paid to an insured "where sickness or mental illness, among other things, prevent a claimant from performing the Essential Duties of Your Occupation, and as a result you are earning less than 20% of your Pre-Disability Earnings."[4] Those benefits last for twelve months, after which benefits continue only if the disability prevents the insured from performing "Essential Duties of *any* Occupation for which you are qualified by education, training, or experience."[5] Payment of long-term disability benefits for a "Mental Illness that results from any cause" and "[a]ny condition that may result from Mental Illness"[6] is limited to a total of twelve months during the lifetime of the insured. The Plan requires

---

[3]*Hall v. UNUM Life Ins. Co.*, 300 F.3d 1197, 1201 (10th Cir. 2002) (holding that the Court is "limited to the 'administrative record' – the materials compiled by the administrator in the course of making [its] decision").

[4]Administrative Record (hereinafter "Rec.") at 39.

[5]*Id.*

[6]*Id.* at 52.

2

the insured to submit "written proof of loss"[7] describing the nature and extent of the claim, which "must be satisfactory"[8] to the Plan administrator, Defendant. The Plan also allows Defendant to "request Proof of Loss" throughout the insured's claimed period of disability.[9]

In May 2004, Plaintiff terminated her employment with IHC due to a variety of health concerns which made her job difficult. In November 2004, Plaintiff filed an application for long-term disability benefits. The application included a statement by Plaintiff regarding her disability, the statements of three physicians, and various medical records. Plaintiff claimed that she was unable to work due to pain and fatigue, but listed stress, depression, anxiety, and post-traumatic stress disorder ("PTSD") as the causes of the pain and fatigue. Two of the three physicians who submitted statements indicated that the causes of Plaintiff's inability to work were psychiatric, including anxiety, depression, and PTSD. One indicated that Plaintiff also suffered from fibromyalgia. However, the other indicated that Plaintiff was "normal" and "healthy" as of September 2004, and that Plaintiff did not have a basis for medical disability because the physician did not believe that Plaintiff suffered from fibromyalgia syndrome and because he did not believe that fibromyalgia should be considered a disabling condition.[10] Finally, the neurologist who submitted a physician statement stated that there were "no objective impairments" to Plaintiff's physical abilities.[11]

---

[7]*Id.* at 34.

[8]*Id.*

[9]*Id.*

[10]*Id.* at 1697.

[11]*Id.* at 1739.

Defendant then began its review of Plaintiff's application. It requested additional information from Plaintiff's physicians. It interviewed Plaintiff by telephone, at which time Plaintiff indicated that workplace stress was the primary cause of her inability to work.[12] It contacted Plaintiff's psychiatrist, who confirmed that Plaintiff had "significant symptoms" of depression and PTSD.[13] By the end of December 2004, Defendant had approved Plaintiff for disability benefits, but indicated that those benefits were based on mental illness and would, therefore, be limited to twelve months.

In September 2005, Defendant notified Plaintiff that her benefits would terminate in November 2005, based on the existing information, which showed that her disability was due to a mental illness, rather than a physical impairment, and advised Plaintiff of her right to appeal the decision. Defendant also requested that Plaintiff provide any "medical documentation supporting that [she was] and remain[ed] Disabled due to a physical condition."[14] Plaintiff filed an appeal in November 2005, contending that Defendant had not considered all relevant medical information. Defendant construed the appeal as a denial of long-term benefits based on physical disability, informed Plaintiff that her appeal was untimely, and indicated that it would complete a review of Plaintiff's request for long-term benefits based on physical impairment and issue a final decision. Defendant gave Plaintiff additional time to provide medical documentation for her claims of physical impairment, and Defendant requested updated medical records for Plaintiff on its own.

---

[12] *Id.* at 137.

[13] *Id.* at 135.

[14] *Id.* at 1298.

4

Defendant contracted with University Disability Consortium ("UDC"), a third party medical services provider, to review Plaintiff's file. UDC arranged for a board certified specialist in neurology and pain management (the "First Reviewer") to review Plaintiff's file. The First Reviewer reviewed the medical documentation provided by Plaintiff and the various health care professionals who had been consulted. The First Reviewer also independently contacted Plaintiff's family doctor, her internist, and a physician's assistant who was treating Plaintiff. After review, the First Reviewer indicated that Plaintiff's subjective description of her level of impairment was inconsistent with the findings of her own physicians, and that the various physical examinations "did not substantiate major physical impairment that would account for all of the many somatic complaints of the [Plaintiff]."[15] The First Reviewer provided a report which contained this information and concluded that Plaintiff did not suffer from a totally disabling impairment based on physical capabilities.

In April 2006, a vocational rehabilitation consultant employed by Defendant prepared a report, based on the First Reviewer's report, that indicated that Plaintiff was capable of sedentary work and identified several occupations within Plaintiff's experience and education. In May 2006, Plaintiff was notified by telephone that a final decision terminating her benefits was being drafted, and in July 2006, Plaintiff received a termination letter from Defendant, informing her that her disability benefits were terminated because she "probably could have performed sedentary occupation throughout her disability."[16]

In August 2006, Plaintiff filed a formal appeal of Defendant's decision. In September 2006, Defendant notified Plaintiff that it would require additional time to review Plaintiff's appeal, due to

---

[15]*Id.* at 1105.

[16]*Id.* at 82.

the need to receive and review additional medical records. Defendant requested, and Plaintiff provided, various medical records. Defendant again contracted with UDC for review of Plaintiff's appeal. The individual chosen by UDS to review the file is listed as a Certified Independent Medical Examiner and a Diplomat of Physical Medicine and Rehabilitation (the "Second Reviewer"). The Second Reviewer reviewed all of the medical records available and spoke with Plaintiff's primary physician. Plaintiffs physician had indicated that Plaintiff described herself as "unable to perform any type of work because of pain,"[17] but also indicated that "there are no objective findings to preclude her from routine work activities."[18] The physician described himself to the Second Reviewer as a patient advocate and "emphasized that [the physician] is trying to agree with [Plaintiff's] impression and feelings on impairment and disability whether or not there is a strong support for her impression."[19] The Second Reviewer, therefore, focused on the physician's objective evaluation that Plaintiff was physically healthy.

The Second Reviewer concluded that the evidence did not support the existence of a disabling impairment. He noted that Plaintiff's complaints about pain were likely legitimate, and even opined that she was likely suffering from fibromyalgia syndrome, but also indicated that the existence of self-reported pain did not, by itself, justify a finding of disabling impairment. The Second Reviewer also concluded that there was "no objective basis to preclude [Plaintiff] from

---

[17] *Id.* at 263.

[18] *Id.*

[19] *Id.*

6

performing the essential duties of a sedentary occupation for the time frame in question on a full-time basis as long as frequent change in position is provided/available."[20]

In December 2006, after receiving the Second Reviewer's report, Defendant concluded that "based on the weight of the evidence available for consideration in this claim, it is determined that the initial decision to deny benefits based on physical disability is supported and will stand."[21] Defendant notified Plaintiff of its decision, and informed her that she had exhausted her administrative remedies under the plan.  Plaintiff filed her Complaint in April 2008.

## II.  DISCUSSION

Plaintiff argues that Defendant's denial of benefits was erroneous because: (1) the Plan does not exclude fibromyalgia syndrome from coverage; (2) the Plan incorrectly refused to consider anything other than objective medical evidence in determining coverage; and (3) none of the reviews conducted by Defendant or independent reviewers contained all of Plaintiff's medical records. Defendant argues that its decision to deny benefits to Plaintiff is supported by the medical evidence, and that the reasonableness of that decision is buttressed by the fact that Defendant submitted the decision to two independent doctors, who both concluded that Plaintiff was capable of working in various sedentary careers.

A.   STANDARD OF REVIEW

Before the Court can make a determination on the basis of the administrative record, it must determine the standard of review which must be applied.  The Plan contains a discretionary authority clause, and the parties agree that the clause, by its terms, requires the Court to apply an arbitrary and

---

[20]*Id.* at 261.

[21]*Id.* at 74.

7

capricious standard to the decision to deny benefits. "A court reviewing a challenge to a denial of employee benefits under [ERISA] applies an arbitrary and capricious standard to a plan administrator's actions if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plans terms."[22] "Under this standard of review, [the Court] will not set aside a benefit committee's decision if it was based on a reasonable interpretation of the plan's terms and was made in good faith."[23]

Plaintiff argues, however, that Utah Insurance Rule 590-218 (the "Utah Rule") allows discretionary authority clauses only insofar as they pertain to the scope of materials that can be considered, and that they cannot require the Court to apply the arbitrary and capricious standard of review. Therefore, Plaintiff argues that the Court must review Defendant's determination of coverage under a de novo standard. Defendant argues, in response, that ERISA preempts the Utah Rule, and that the Court may apply an arbitrary and capricious standard of review.

The Utah Rule states, in relevant part:

This rule prohibits the use of reservation of discretion clauses in forms that are not associated with ERISA employee benefit plans. It creates a safe harbor for insurance companies that provide insurance to ERISA employee benefit plans sponsored by employers, allowing insurers to know what language in insurance forms is acceptable to the department

\* \* \*

"Reservation of discretion clause" means language in a form that purports to reserve discretion to interpret the terms of the contract, to determine eligibility for benefits under the plan, or to establish a scope of judicial review or standards of interpretation, to the plan administrator, the insurance company acting in the capacity of a plan administrator in an employee benefit plan, or the insurance company acting as the insurer.

---

[22]*Trujillo v. Cyprus Amax Minerals Co. Retirement Plan Committee*, 203 F.3d 733, 735 (10th Cir. 2000) (citing *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998)) (internal quotation marks omitted).

[23]*Id.*

* * *

The commissioner finds reservation of discretion clauses in forms to be in violation of [Utah law]. Accordingly, such clauses are not permitted in a form unless provided otherwise by this rule.[24]

By it's terms, the Utah rule prohibits discretionary authority clauses for non-ERISA insurance plans, and provides some limitations on discretionary authority clauses in ERISA insurance plans. It is to a limitation claimed by Plaintiff that the Court turns first.

1. *Does the Utah Rule impose a de novo standard?*

Plaintiff argues that the Utah rule is intended to limit the effect of discretionary authority clauses. Specifically, Plaintiff argues that, under the Utah Rule, a discretionary effect may only serve to limit the scope of material that the Court may consider when reviewing an appeal of a plan administrator decision. It is unclear what the Utah Insurance Commission intended by the phrase "scope of review." However, this Court dealt with a similar issue in *Hancock v. Metropolitan Life Ins. Co.*[25] and concluded that "scope of review" was synonymous with "standard of review."[26] Specifically, the Court noted that the Utah Rule expressly states that "the federal court will determine the level of discretion that it will accord (the plan administrator's) determinations,"[27] and that "it is meaningless for the rule to state that 'the federal court will determine *the level of discretion that it will accord (the plan administrator's) determinations,*' if discretionary clauses do not establish an abuse of discretion standard of review."[28]

---

[24] Utah Insurance Rule 590-218-2 to 590-218-5.

[25] 2008 WL 2996723 (D. Utah Aug. 1, 2008).

[26] *Id.* at *5-6.

[27] Utah Insurance Rule 590-218-5(3).

[28] *Hancock*, 2008 WL 2996723, *6.

The Court reaffirms the holding in *Hancock* that the standard of review for decisions made by a plan administrator under a plan which contains a discretionary authority clause is an abuse of discretion standard. This holding is in keeping with Tenth Circuit precedent that, although "the amount of deference afforded by the reviewing court may differ depending on the circumstances of the case, '[t]he standard always remains arbitrary and capricious.'"[29]

2.      *Is the Utah Rule preempted by ERISA?*

Even if the Utah Rule were intended to impose a de novo standard of review of insurer decisions, that intention could not be implemented by the Court because ERISA preempts the Utah Rule. ERISA expressly preempts most state law. "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."[30] A narrow class of state laws are "saved" from preemption, however, by another provision of ERISA, which states that "[e]xcept as provided in subparagraph (B), nothing in this chapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking or securities."[31] The United States Supreme Court has stated that, in order to fall within the scope of the ERISA "saving clause," a state law must "be specifically directed towards entities engaged in insurance" and "substantially affect the risk pooling arrangement between the insurer and insured."[32]

---

[29]*Id.* (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097 (10th Cir. 1999)) (brackets in original).

[30]29 U.S.C. § 1144(a).

[31]*Id.*, § 1144(b)(2)(A).

[32]*Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342 (2003).

The parties agree that the Utah Rule is directed specifically towards entities engaged in insurance, so the Court need only determine whether the Utah Rule "substantially affects" the risk pooling arrangement between insurers and the insured.  The Court concludes that it does not.

The nature of insurance is to provide a hedge against risk.  Individuals know that bad things can happen to them, and they contract with insurers to cover themselves in the event that those risks become reality.  By purchasing insurance, then, the insured has transferred the risk of adverse events from herself to the insurer, and the insurer contracts to accept that risk in return for insurance premiums that take into consideration the risk of adverse events occurring and the magnitude of the potential loss from those events.  The greater the probability of an adverse event, or the greater the potential cost of the adverse event, the higher the insurance premiums are likely to be.  Some individuals face higher risks of certain adverse events, and others face much lower risks.  Risk pooling is the term used to describe the means by which insurers cover individuals of all risk levels across a variety of adverse event probabilities. By risk pooling, an insurer is able to spread the risk that it will have to expend its resources to compensate a particular victim of an adverse event over all those paying premiums.

Unlike state insurance mandates, which require insurers to assume risk (and consequently modify premiums) for particular adverse events, the Utah Rule applies only to the administrative function of interpreting the insurance plan's terms and judicial review of the use of that administrative function.  The Court, therefore, finds that the Utah Rule does not substantially affect the risk pooling agreement because it is unrelated to either the risk of adverse events occurring or their potential magnitude.[33]  Because the Utah Rule does not substantially affect the risk pooling

---

[33] *See Allison v. UNUM Life Ins. Co. of America*, 381 F.3d 1015, 1027 (10th Cir. 2004) (holding that a law that does not "effect a change in the risk borne by insurers and the insured"

agreement between insurers and the insured, the Court finds that the Utah Rule is not covered by the ERISA savings clause, and that ERISA, therefore, preempts the Utah Rule. Finally, the Court find that the requirements of the Utah Rule cannot be applied to the Plan, that the Plan's discretionary authority clause is effective, and that the Court must apply an arbitrary and capricious standard to its review of Defendant's denial of benefits to Plaintiff.

B.  BENCH TRIAL ON THE PAPERS

In reviewing Defendant's decision under the arbitrary and capricious standard of review, the Court "need only assure that the administrator's decision fall[s] somewhere on the continuum of reasonableness – even if on the low end."[34] Because the administrative record fails to show unreasonableness on the part of Defendant, the Court will affirm Defendant's decision to terminate disability benefits based on mental illness to Plaintiff and to deny long-term disability benefits based on physical impairment.

Defendant granted Plaintiff's initial request for disability benefits, based on Plaintiff's contemporaneous claims of disability caused by stress, PTSD, depression, and other concerns. These claims were supported by the statements of the physicians who submitted physician statements related to her application for benefits. Because Defendant granted Plaintiff's initial request for benefits, Plaintiff may not complain of injury related to that decision, so the Court will focus solely on Defendant's 2005 determination to terminate Plaintiff's disability benefits based upon mental

---

does not substantially affect the risk pooling arrangement") (quoting *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 466 (10th Cir. 1997)).

[34]*Kimber*, 196 F.3d at 1098 (quoting *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999)).

impairment and Defendant's 2006 determination to deny disability benefits to Plaintiff based on physical impairment.

      1.    *Termination of benefits based on mental impairment*

Defendant terminated Plaintiff's disability benefits in November 2005 because the Plan provided for a maximum of twelve months disability benefits over the life of the insured when that disability was the result of mental illness. Plaintiff applied for, and received, disability benefits in November 2004 based on her substantiated claims of disability due to depression, stress, and PTSD. The Court finds that Defendant was reasonable in determining that those benefits expired after twelve months, in accordance with the express terms of the plan. Moreover, when Plaintiff appealed that decision, Defendant submitted Plaintiff's file to a third party reviewing organization, and the First Reviewer concurred with Defendant's conclusion that there was no objective medical evidence that Plaintiff was disabled as defined by the Plan. The First Reviewer relied on the records and documentation provided by Plaintiff and Defendant, and conducted his own investigation of Plaintiff's medical history.

      2.    *Denial of long-term benefits based on physical impairment*

Defendant concluded, after internal review of the record, including documents provided by Plaintiff and her doctors, that Plaintiff was not physically disabled, as defined in the Plan. Defendant therefore denied long-term disability benefits to Plaintiff, and Plaintiff appealed. Defendant again obtained the services of an outside physician, completely unconnected to Defendant, who concurred with Defendant's conclusion. The Second Reviewer relied on the medical records and other documentation provided by Plaintiff and Defendant, but also conducted his own investigation, including interviews with those physicians who had examined Plaintiff.

3. *Plaintiff's Challenge*

Plaintiff argues that Defendant's reviews were flawed because they relied only on objective medical evidence, and did not consider her subjective reports of pain. This argument is directly contradicted by the record, which indicates that the First Reviewer and Second Reviewer (collectively, the "Reviewers") considered the reports provided by Plaintiff, which included her subjective reports of pain. The record also indicates that the Reviewers followed up on those subjective reports, and compared the objective medical evidence against those subjective reports. After comparing the subjective reports to the objective medical evidence, the Reviewers concluded that there was no medical evidence to support Plaintiff's claims that she was disabled due to her subjective reports of pain.

Moreover, the Plan, by its express terms, requires Plaintiff to provide evidence to support her claims of disability, and requires that the evidence be to the satisfaction of Defendant.[35] Plaintiff appears to argue that her subjective reporting of pain should be given greater weight than the conclusions of the plan administrator or the medical conclusions of an independent, third party physician. To do so would be to turn insurance coverage on its head, allowing the insured to have the final word on when they are entitled to coverage.

Plaintiff also argues that Defendant, and the Reviewers, did not complete a full review of the medical history because certain items were missing from the files. The record shows, however, that Defendant repeatedly encouraged Plaintiff to provide any and all evidence which would substantiate her claims. Plaintiff has provided no legal authority in support of the contention that failure by

---

[35]*See McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred and the insurer must prove facts that bring the loss within an exclusionary clause of the policy.").

Plaintiff to completely divulge her medical history provides grounds for declaring Defendant's review unreasonable. As noted, Defendant and the Reviewers considered everything provided by Plaintiff, and collected its own information through follow-ups with various physicians who had examined Plaintiff.

Finally, Plaintiff argues that the Plan did not contain an express exemption for fibromyalgia syndrome, and essentially argues that Defendant denied benefits because she had fibromyalgia syndrome. There is no support in the record for such a conclusion. When Plaintiff initially submitted her application for benefits, one of the physician statements submitted concurrently with the application indicated that Plaintiff had complained of pain consistent with fibromyalgia syndrome, and expressed an opinion that fibromyalgia was not a disabling condition, but also indicated that the physician did not believe that Plaintiff suffered from fibromyalgia. At various other places in the record, fibromyalgia was mentioned as a possible source for Plaintiff's reported pain, but a majority of doctors expressed skepticism about fibromyalgia as the correct diagnosis for Plaintiff's problems.

Plaintiff, in her Memorandum, references a paper published by the American Academy of Disability Evaluating Physicians regarding fibromyalgia and disability classifications.[36] She argues that the Second Reviewer indicated that Plaintiff was likely suffering from fibromyalgia syndrome. The Second Reviewer never assigned a classification to Plaintiff's apparent fibromyalgia, nor did any other physician who investigated her, but the Second Reviewer concluded that, even suffering from fibromyalgia syndrome, Plaintiff was not disabled, as defined by the Plan. Therefore, while the Court may sympathize with the chronic pain that many with fibromyalgia syndrome suffer, the

---

[36] *See* Docket No. 19 at 27.

determination by Defendant to terminate disability benefits based on mental impairment, and to deny long-term benefits based on physical impairment, cannot reasonably be said to have been based on the fact that Plaintiff does or does not have fibromyalgia.

All of Plaintiff's arguments would fail even under a de novo review, and fail under an arbitrary and capricious standard of review. Defendant reviewed information provided by Plaintiff, Plaintiff's physicians, and Plaintiff's employer. Defendant collected additional information from Plaintiff and Plaintiff's treating physicians, and conducted in-house and independent reviews of Plaintiff's application and all relevant documentation. The Reviewers concluded that there was no objective evidence which would allow the conclusion that Plaintiff was disabled, in that they believed she was capable of maintaining a number of sedentary careers within her training and education. The weight of the evidence is clearly in favor of Defendant, and Plaintiff essentially argues only that her subjective reports of pain should be given an extraordinary amount of weight. There is no legal basis to do so, and the Court will enter final judgment in favor of Defendant.

### III.  CONCLUSION

After careful consideration of the administrative record and the legal arguments presented by the parties, the Court finds that Defendant is entitled to final judgment on all counts. It is therefore

ORDERED that Plaintiff's Motion for Judgment on the Administrative Record (Docket No. 18) is DENIED. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff on all counts.

DATED   July 16, 2009.

BY THE COURT:

_____
TED STEWART
United States District Judge